[Crim. No. 213.    Third Appellate District.—July 2, 1913.]

## THE PEOPLE, Respondent, v. GEORGE A. DUNCAN, Appellant.

CRIMINAL LAW—TITLE OF ACT—SECTIONS OF PENAL CODE RELATING TO PROSTITUTION.—The act of March 21, 1905 (Stats. 1905, p. 655), entitled "An act to add seven new sections to the Penal Code to be numbered 266a . . . 266g, all relating to the prostituting of women," does not violate the constitutional requirement that "every act shall embrace but one subject which shall be expressed in its title," in that it makes it a crime for a man to allow or permit his wife to remain in a house of prostitution.

ID.—PROSTITUTION—CRIME OF LEAVING WIFE IN HOUSE.—Section 266g of the Penal Code makes it a crime for a man to permit or allow his wife to remain in a house of prostitution, without having had anything to do with placing or keeping her therein.

ID.—DEFENSE—ATTEMPT OR DESIRE TO REMOVE WIFE FROM PLACE.—But he may avoid the penalty of the law by showing that he has in good faith used all lawful means to cause the removal of his wife from such surroundings, or that he was anxious to have her ·leave and tried in all reasonable ways to induce her to do so.

ID.—KNOWLEDGE OF HUSBAND—LETTERS AS EVIDENCE.—In the prosecution of a man for permitting his wife to remain in a house of prostitution, letters written by him to her, some before and some after the times mentioned in the information, are ·admissible to show his knowledge of her continuous vocation.

ID.—DEFENSE—PRIOR UNCHASTITY OF WIFE.—In such prosecution the defendant cannot show, as a matter of defense, that prior to their marriage his wife was a prostitute.

ID.—APPEAL—REVIEW OF INSTRUCTIONS REFERRED TO ONLY BY NUMBERS. An appellate court is not called upon to examine instructions which were refused by the trial court, where the appellant refers to them in his brief only by their numbers. ⸍

APPEAL from a judgment of the Superior Court of Humboldt County and from an order refusing a new trial.    Geo. D. Murray, Judge.

The facts are stated in the opinion of the court.

H. C. Nelson, and Irwin T. Quinn, for Appellant.

U. S. Webb, Attorney-General, and J. Chas. Jones, Deputy Attorney-General, for Respondent.

CHIPMAN, P. J.—Defendant was accused by information
"of the crime of permitting his wife to remain in a house of
prostitution, committed as follows: That the said George A.
Duncan, on November 12, 1911, at and in the county of Humboldt and state of California, and from thence continuously
until on or about the 12th day of April, 1912, did willfully,
unlawfully, knowingly and feloniously, allow and permit one
Ella Duncan, who was then and there . . . the wife of him
the said George A. Duncan, to remain in a house of prostitution, known as No. 48 Fourth Street, Eureka, . . . contrary,"
etc.   The jury found the defendant guilty as charged and the
court sentenced him to imprisonment at San Quentin for the
term of four years.   Defendant's motion for a new trial was
denied and he appeals from the judgment and order.

1. The constitutionality of the law under which the trial was
had is challenged in so far as it makes it a crime by the husband who "allows or permits" his wife to remain in a house
of prostitution.   The objection is that it violates section 24
of article IV of the constitution which provides that "Every
act shall embrace but one subject, which shall be expressed in
its title. . . ."   The act was first passed in 1891 (Stats. 1891,
p. 285) with the following title: "An act to prevent the placing or keeping or leaving of married women in houses of
prostitution, and to punish persons therefor."   The statute
was added to the codes by the act of March 16, 1901 (Stats.
1901, pp. 433, 449) as section 266g, and shared the fate of
other attempts to amend the codes by what was termed
"wholesale legislation," in *Lewis* v. *Dunne,* 134 Cal. 291,
[86 Am. St. Rep. 257, 55 L. R. A. 833, 66 Pac. 478].   (*People*
v. *Oates,* 142 Cal. 12, [75 Pac. 257].)   The statute was, by
act of March 21, 1905, [Stats. 1905, p. 655], added to the
Penal Code, as section 266g, and is now the law, under the
title: "An act to add seven new sections to the Penal Code to
be numbered 266a . . . and 266g, all relating to the prostituting of women."

It was held, in *Deyoe* v. *Superior Court,* 140 Cal. 476, [98
Am. St. Rep. 73, 74 Pac. 28], that an act entitled an act to
add a new section to a named code relating to a named subject is sufficient to embrace all matters relating to such subject.   The subject dealt with in the act is the subject men-

tioned in the title—namely, "the prostituting of women," and is, we think, sufficiently expressed therein.

2. It is contended that "before the defendant could be guilty of any crime under section 266g of the Penal Code some act or conduct on his part was necessary whereby he placed, or kept, or committed his wife to a house of prostitution, and the simple act of allowing her presence there is not intended to be a crime." The statute makes it a felony for a husband, "by force, intimidation, threats, persuasion, promises, or any other means, places or leaves . . . his wife in a house of prostitution, or connives at or consents to, or permits, the placing or leaving of his wife in a house of prostitution, or allows or permits her to remain therein." The placing of the wife in such house is a crime distinct from that of allowing or permitting her to remain therein. She may have found her way to such a house through the connivance, or persuasion, or threats of some person other than her husband, or she may have voluntarily and without the knowledge or consent of her husband taken up her residence in a house of prostitution, but her husband may be guilty of violating the statute, if, after the fact is known to him, he "allows or permits her to remain therein." And whether the defendant did, in the present case, allow or permit his wife to remain in such a house was a question for the jury in view of all the facts and circumstances. He was not charged with having placed her there; the charge was that he knowingly allowed and permitted her to remain in a house of prostitution.

In *People* v. *Conness,* 150 Cal. 114, [88 Pac. 821], it was held that "if the defendant did not in the first instance, directly or indirectly connive at, consent to, or permit of her going there (to a bawdy house), he must to some extent be an accomplice to her remaining there after he has knowledge of the fact." (Syllabus.) Of course, it cannot be true that a husband may not avoid the severe penalty of the law by showing that he has in good faith used all lawful means to cause the removal of his wife from such surroundings, or that he was anxious to have his wife leave and tried in all reasonable ways to induce her to do so.

The court said, in the Conness case, in defining the words "allow" or "permit," as used in the statute: "It implies some sort of assent on the part of the husband. There must

be some active wish, or at least willingness, in his mind, after he has knowledge of her presence in the house, that she would continue there; something more than mere indifference to her whereabouts or passive sufferance in a case where the circumstances do not call upon him to interfere with her conduct.'' The opinion in the Conness case furnishes the last word that may be said in support of the salutary and wise purpose of the statute and makes quite clear that it is to be given every reasonable application to effect its object. And it was held that ''a husband shall not allow or permit his wife to remain in a house of that character, even to engage in an innocent or otherwise useful occupation therein. . . . There are good reasons for the view that the legislature intended the statute to be effective according to its literal import.''

It appeared that defendant and his wife were married at San Francisco, April 24, 1911, and lived there, together with Mrs. Duncan's two boys by a former marriage, until June 7, 1911, when she went to Eureka, Humboldt County. She had formerly lived in Eureka and went from there to San Francisco, as she testified, to marry the defendant. One of the alleged errors of the trial court, strongly urged for reversal, to be noticed hereafter, was the refusal of the court to allow defendant to prove that prior and up to the time of her marriage she had been living the life of a prostitute. She was the principal witness for the plaintiff. Being asked what took place between her and her husband and under what circumstances she came to Eureka after her marriage, she testified: ''I simply told him I would have to go to work if he would not go to work. I had to live and I had to eat, I had to make money to live on. He said he couldn't help it, he said he could not seek employment. No quarrel or anything like that. I simply came back up here and I went into a house to make my bread and butter. Q. You mean that you came back here and went into a house of prostitution? A. Yes, sir. Q. And you became a prostitute? A. Yes, sir.'' She was then asked to state where—to what house she went first, and questions followed to show just what kind of a life she led there. She testified that she went first to a house of ill-fame at No. 114 Fourth Street ''and worked there as a prostitute''; next she went to a similar house at No. 317 C Street; at this house she was taken sick and went to a hospital

from which she returned to 317 C Street and remained there plying her vocation as a prostitute until about the first of November, 1911, when she became the proprietor of a house of her own at No. 48 Fourth Street and remained there runing it as a house of prostitution until April, 1912, as laid in the information. This testimony went in over defendant's objection as irrelevant, immaterial, and incompetent and was offered and admitted solely for the purpose of showing what came to defendant's knowledge. The ruling of the court was proper. In April, 1912, as she testified, she "bought out Dolly Singer," the proprietor of another similar establishment.

Not long after she had entered upon this malodorous life, her husband found employment at a hotel in Modesto where he remained for nearly a year and a half and secured $100.00 per month wages, at first, and later $120.00 per month. His wife testified that she wrote her husband frequently, commencing soon after she arrived at Eureka, and kept him informed of her doings and her life and received many letters from him, some of which she destroyed and quite a number she preserved, which were introduced in evidence. Some of these were written before the dates mentioned in the information and were objected to for that reason. They were admitted to show defendant's knowledge of his wife's continuous vocation and properly, we think. It is impossible to read these letters without concluding that the jury were fully justified in finding that defendant knew what kind of life his wife was leading and that he encouraged her in it and was to some extent the sharer of her tainted earnings. In one or two of his letters he speaks of his intending to get some girls for her. His letters were not addressed to her in her true name but as Miss Goldie Russell, her bawdy house name. He fell in with a man by the name of Mullen who was going to Eureka. He gave him a card thus addressed and told him to call on her. This letter is dated February 22, 1912, and is within the dates mentioned in the information, and reads, in part: "Dear Wifey. Received your dear letter. So glad to hear from you. There is a fellow coming up to Eureka by the name of Mullen. He has some coin as I know that he has two hundred dollars or more in the bank here. He has been up there before. I gave him a card with your name on it,

get all that you can. I guess that you had better stay up there awhile and see if you can make some money as things here are awful bum, no rain. Be good and careful and take care of yourself." Mullen went to her house and presented the card. It is not necessary to pursue this correspondence further. It entirely dispels defendant's claim that his wife left him after a quarrel and remained away from him against his wish and consent. If they parted in anger, which his wife says is not true, it was soon dissipated. His letters are couched in terms utterly inconsistent with the existence of feelings of hostility between them.

Witness Nichols, United States immigration inspector, was instrumental in bringing the case. He testified that the defendant admitted to him, after his arrest, in the presence of the district attorney that he knew his wife went to Eureka to enter a house of prostitution and that he had received money from her while there.

3. Evidence was offered by defendant and, on objection, was refused, to the effect that, prior to her marriage with defendant, his wife had been for years engaged in the vocation of a prostitute. The questions did not call for knowledge of the fact by defendant at the time of his marriage. No evidence appeared in the case from which it could be inferred that he placed her in a bawdy house or that he knew, when she left him, that she intended entering one, except his admission to witness Nichols. Indeed, defendant testified that he did not know she intended to enter such a house in Eureka and that he at no time had more than a suspicion of what kind of a life his wife was leading. He claimed that she left him against his wish and without his consent. The question, then, is simply this: Was he entitled to show her character for chastity before he married her as matter of defense for permitting her to remain in a house of ill-fame? We think he was not. Nothing appearing to the contrary, we must assume that, whatever may have been her past life, they entered into the marriage relation in good faith, each intending to keep to the other the marriage vows of fidelity. Instances are not frequent but are known to have happened where men of respectability have taken unchaste women to wife and have enabled their spouses to live down their evil reputations and to lead honorable and virtuous lives. Even if the fact be

known to a man that the woman he is about to marry has been a common harlot, the duty is still upon him to restrain her from relapsing to her former unchaste life and to rescue her from it should she return to it. The question as to her former life has nothing to do with his duty or his guilt under the law if he permits her, being his wife, to live in a house of prostitution. The statute makes no distinction such as the defendant's contention would incorporate in it. As was said by Mr. Justice Shaw, in the Conness case (150 Cal. 114, [88 Pac. 821]): "There are good reasons for the view that the legislature intended the statute to be effective according to its literal import."

The comments of Mr. Justice Cooper, in his concurring opinion in *People* v. *Mock Yick Gar*, 14 Cal. App. 334, [111 Pac. 1039], relied on by defendant, were made under circumstances widely different from the facts here. There the defendant was charged with *placing* his wife in a house of prostitution. The uncontradicted testimony was that when the defendant went through the form of marriage with the Japanese woman he had a wife living, from whom he had not been divorced, which furnished a complete defense under section 266g of the Penal Code. Judge Cooper's remarks arose from a doubt entertained by him as to the credibility of the Japanese woman who, as he said in the opinion, "had been a prostitute, living in a house of prostitution, for some time before she claimed to have married defendant. She afterward apparently with the knowledge and consent of defendant, returned to her former mode of life." Referring to the statute he said: "It could not have been intended for the punishment of a man who marries a prostitute and continues to live with her in a house of prostitution, which abode she voluntarily selected. In such case the man has not by his act caused his wife to enter and enlist in the army of prostitutes who ply their vocation. She was already there; and while it is a low order of man who will live with such a woman, the statute does not make it a crime to do so."

It will at once be seen that the cases there and here are wholly unlike and arose under different parts of the statute. Judge Cooper's views were not necessary to the decision as the court held that the woman was not the wife of the defendant. But, conceding their correctness, they lend no aid to defendant here. The sole question now before us is—was the

defendant entitled to defend his conduct by showing the former unchaste character of his wife? We do not think it was material or would have aided his defense had it been shown. It is not contended that it was admissible as affecting the credibility of the witness. The suggestion of defendant that the jury might have been influenced in defendant's favor had they known the facts, furnishes no ground for holding that the court erred in excluding the evidence.

4. It is further contended that when defendant's wife left his domicile in San Francisco she "was from that time on beyond the control of defendant. All responsibility on the part of defendant to care for and protect her ceased." Sections 156 and 175 of the Civil Code are cited to show that "the husband is under no obligation to support a wife who has abandoned him without justification, though he has not solicited her to return." (Citing *Kessler* v. *Kessler*, 2 Cal. App. 509, [83 Pac. 257].) The sections referred to have relation to financial support. The jury found from sufficient evidence that there was no abandonment of defendant by his wife and, equally supported by the evidence, the jury found that he knew where and how she was living and shared in her illgotten gains. The point is not deserving of serious consideration.

5. Error is assigned in giving instruction numbered IV requested by respondent. The criticism is that, under the instruction, "it was only necessary to show knowledge to convict appellant." The instruction is of some length and is not here copied. We have carefully examined it and find that the comment of defendant is not justified. The knowledge of defendant referred to was knowledge of all the preceding facts pointed out by the court and these facts were the essential elements of the crime.

Instruction V is criticised as not expressing the law as laid down in *People* v. *Conness*, 150 Cal. 121, [88 Pac. 824]. This instruction is as follows: "The words 'allow' or 'permit' as used in the statute defining the offense alleged in the information imply some sort of assent on the part of the husband to his wife's remaining in a house of prostitution. There must be some active wish or at least willingness in his mind after he has knowledge of her presence in the house that she should continue there. To prove a defendant guilty of violating such statute, it is not necessary to show that he actually placed his

wife in a house of prostitution.   It is only necessary to prove that his wife was in a house of prostitution, that he had knowledge of the fact that it was a house of prostitution and of the fact that his wife was in said house, and that after such husband had such knowledge he allowed or permitted her to remain therein.''

This instruction was intended to give the defendant the benefit of the view taken of the statute in the Conness case and we think is sufficiently clear and when read in its entirety and in connection with other instructions is in no wise misleading or harmful.   The last half of the instruction does not, as is contended, ''completely'' or at all nullify the definition of ''permit'' and ''allow'' given in the first half of the instruction.

Instruction numbered X was a statement that it would be no defense to prove that the wife had borne an unchaste reputation.   The instruction is in line with the ruling of the court on the evidence excluded, already noticed.   We think the ruling was correct and so also the instruction.   In *People v. Bosquet,* 116 Cal. 75, [47 Pac. 879], the wife was shown to have been of unchaste character and did not reform after her marriage.   In *People* v. *Flores,* 160 Cal. 766, [Ann. Cas. 1913A, 582, 118 Pac. 246], the prosecution was under section 266 of the Penal Code—enticing an unmarried female under the age of eighteen years into a house of ill-fame for the purposes of prostitution.   It was held necessary ''that she should have been of previous chaste character,'' for the statute so specifically provides.   No such requirement is necessary in a prosecution under section 266g.

It was not error to refuse instruction numbered XVII requested by defendant.   It is not a correct statement of the law as laid down in the Conness and Bosquet cases.

Error is claimed for refusal of the court to give certain instructions designated only by their numbers.   We are not called upon to examine instructions thus referred to in the brief.   (*People* v. *Chutnacut,* 141 Cal. 685, [75 Pac. 340].)

We think the jury were well and correctly instructed and as fully on all points as the case required.   There is ample evidence to justify the verdict.

The judgment is affirmed.

Hart, J., and Burnett, J., concurred.